In re Fred STEINBERG and Phanvika Steinberg, Debtors.

Monterey Mushrooms, Inc.; Hollar and Greene Produce Company, Inc; and Northwest Choice, Inc., Plaintiff,

v.

Fred Steinberg, Debtor/Defendant.

Bankruptcy No. 03–30417–BKC–PGH.

Adversary No. 03–3099–BKC–PGH–A.

United States Bankruptcy Court, S.D. Florida.

Dec. 2, 2003.

Robert C. Furr, Boca Raton, FL, Craig I. Kelley, West Palm Beach, FL, for Debtors.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAUL HYMAN, JR., Bankruptcy Judge.

**THIS MATTER** came before the Court for trial on September 19, 2003 upon the

Complaint to Determine Dischargeability of Debt originally filed by Monterey Mushrooms, Inc. ("Monterey"), Hollar and Greene Produce Company, Inc. ("Hollar and Greene") and Northwest Choice, Inc. ("Northwest"). The Court, having reviewed the pleadings, having heard the testimony of the witnesses, having reviewed the exhibits admitted into evidence, having heard the argument of counsel and being otherwise being fully advised in the premises, enters the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## FINDINGS OF FACT

Fred Steinberg ("Debtor") and his wife, Phanvika Steinberg filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code ("Bankruptcy Code") on January 28, 2003. Pursuant to §§ 1107 and 1108 of the Bankruptcy Code, Mr. and Mrs. Steinberg continued to operate their business and manage their properties as debtors-in-possession. On or about April 7, 2003, Monterey, Hollar and Greene and Northwest filed a complaint to determine the dischargeability of Mr. Steinberg's debts to them (the "Complaint"). Subsequently on June 27, 2003, Northwest voluntarily dismissed its claims against the Debtor.

Debtor is the president and sole shareholder of Express Business Funding, Inc. ("Express"), which is also a Debtor–in–Possession in a Chapter 11 proceeding currently pending in the United States Bankruptcy Court for the Southern District of Florida under Case No. 03–30416–BKC–PGH. Express is a financing company that purchases accounts receivable at a discounted fee. On August 9, 2000, Express and Preferred Fresh Foods ("Preferred Fresh") entered into an agreement entitled the "Accounts Receivable Purchase and Sale Agreement" (the "Factoring Agreement"). Pursuant to the Factoring Agreement, Preferred Fresh would submit its outstanding receivables to Express, which would advance 80% of the receivable amount to Preferred Fresh. Express would then collect the receivables from Preferred Fresh's customers, deduct a fee and remit the balance to Preferred Fresh. The Factoring Agreement was executed by the Debtor, who was the President and sole shareholder of Express and Sime Dijan ("Dijan"), the then-President and sole shareholder of Preferred Fresh. During the first three months of the companies' relationship, Express provided funding to Preferred Fresh pursuant to the Factoring Agreement.

At some point between August and October 2000, the Debtor and Express were informed by certain creditors of Preferred Fresh that Preferred Fresh had breached the statutory trust arising under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499e ("PACA"). Those creditors are not a party to the current action ("Non-party Creditors"). The attorneys for the non-party creditors demanded that Express repay accounts receivable that had been previously purchased and collected so that Preferred Fresh would have the available cash to fund its operations and pay the non-party creditors. Alternatively, the attorneys for the non-party creditors advised Express that they could immediately terminate Preferred Fresh's business operations and obtain repayment from Express of all sums previously paid by Preferred Fresh to Express. In essence, Express was faced with the choice of either allowing Preferred Fresh to close its doors, resulting in a loss to Express of over $400,000.00 or returning funds to Preferred Fresh so that it could pay the non-party creditors.

After the Debtor obtained Preferred Fresh's financial information, he decided that Express would provide lending to Preferred Fresh in order to keep the company operating rather than simply providing funds under the Factoring Agreement. The goal of the Debtor was to keep Preferred Fresh operating long enough for it to repay the funds lent by Express, as well as the funds advanced pursuant to the Factoring Agreement.

In October 2000, the Debtor took control of the majority interest of Preferred Fresh in exchange for Express providing lending to Preferred Fresh. Dijan and Preferred Fresh's accountant, Steve Bens ("Bens") remained responsible for customers, sales, purchasing and day-to-day operations. At that time, the Debtor also took physical possession of Preferred Fresh's corporate record book which included its stock certificates. At the Debtor's direction, Dijan executed the stock certificates of Preferred Fresh and turned them over to the Debtor. Subsequently, also at the Debtor's direction, Express employee, Chris Bannon ("Bannon") filled out the stock certificates using information provided by the Debtor. As reflected on the stock transfer ledger, 20% of the stock remained with Dijan, 60% was transferred to the Debtor and 20% was given to Bannon as incentive for his assistance in turning Preferred Fresh into a profitable business. One month later, Bannon transferred his shares to the Debtor.

After the transfer of the Preferred Fresh stock to the Debtor, he began speaking with Dijan and Bens on a weekly basis regarding the financial condition of Preferred Fresh and he was provided with the company's monthly financial reports. Although Dijan and Bens began referring to the Debtor as the "Chairman," there is no evidence to indicate that this was reported to the Florida Secretary of State.

Nor did the Debtor attend any of the Board of Directors meetings for Preferred Fresh.

From October 2000 through early 2002, Express continued to collect all of Preferred Fresh's accounts receivable to pay down its loans. In order for Preferred Fresh to pay its bills, the Debtor continued to authorize lending by Express to Preferred Fresh.

In an effort to increase the available capital to finance the operations of Preferred Fresh, while also attempting to minimize the balance on the loans extended by Express to Preferred Fresh, the Debtor began to solicit investors into Preferred Fresh. In November and December 2000, Milo and Michelle Seidl ("the Seidls") and Mark and Deanna Steinberg ("the Steinbergs"), who are not related to the Debtor, purchased stock of Preferred Fresh. The checks from both purchases were made payable to the Debtor and the stock certificates were signed by the Debtor individually. However, the $25,000.00 payment from the Steinbergs was not deposited into the Debtor's personal checking account but rather was used as a credit against the outstanding loan receivable due to Express from Preferred Fresh by depositing the check into the Express account. Likewise, the $50,000.00 payment from the Seidls was also deposited into the Express account for the same purpose.

The Debtor never had signatory authority on any bank accounts of Preferred Fresh, nor did he receive funds from Preferred Fresh. Express received funds due to it in connection with the factoring relationship with Preferred Fresh, but did not receive any other funds from Preferred Fresh. The Debtor never signed any documents on behalf of Preferred Fresh including, but not limited to, vendor agreements and performance contracts. Furthermore, the Debtor did not receive

compensation or any other funds from Preferred Fresh.

Although Preferred Fresh's PACA license identifies the Debtor as the Chairman of the Board of Directors of Preferred Fresh and the owner of more than ten percent (10%) of its outstanding stock, the Debtor testified that he has never seen the license, nor did he participate in the submission of the application and the documents required to obtain the license.

From March 23, 2001 through May 9, 2002, Monterey and Hollar and Greene sold perishable agricultural commodities in the amount of $59,208.80 to Preferred Fresh. Those sales were subject to PACA and are the basis of the matter at hand.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

### A. Individual Liability under PACA

■ The PACA statute regulates trading in agricultural commodities such as fruits and vegetables. PACA establishes a statutory trust for the benefit of sellers and suppliers. The trust arises the moment perishable goods are delivered by the seller. *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F.Supp. 346, 348 (S.D.N.Y.1993). Liability under the PACA statute "attaches first to the licensed commission merchant, dealer or broker of the perishable agricultural commodities. If, however, the assets of the licensed commission merchant, dealer or broker are insufficient to satisfy the PACA liability, then others may be held secondarily liable if they had some role in causing the corporate trustee to commit the breach of trust.... [I]ndividual shareholders, officers or directors of a corporation who are in a position to control trust assets, and

who breach their fiduciary duty to preserve those assets may be held personally liable under PACA." *Golman–Hayden, Inc. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 351 (5th Cir.2000); *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir.1997).

■ The test for individual liability involves two factors: 1.) "whether the individual's involvement with the corporation was sufficient to establish legal responsibility" and 2.) "whether the individual in failing to exercise any appreciable oversight of the corporations' management, breached a fiduciary duty owed to PACA creditors." *Golman–Hayden*, 217 F.3d at 350 (citing *Shepard v. K.B. Fruit and Vegetable, Inc.* 868 F.Supp. 703, 706 (E.D.Pa. 1994)).

In the instant case, Monterey and Hollar and Green failed to show that the Debtor's involvement with Preferred Fresh was sufficient to establish legal responsibility. As such, this Court concludes that the Debtor should not be held individually liable for the debts of that corporation. The evidence presented at trial indicated that the goal of the Debtor was to keep Preferred Fresh operating long enough for it to repay both the funds lent by Express and the funds advanced pursuant to the Factoring Agreement. It was Dijan and Bens who remained responsible for customers, sales, purchasing and day-to-day operations. The Debtor never had signatory authority on any bank accounts of Preferred Fresh, nor did he receive a salary from the corporation. In addition, the Debtor never signed any documents on behalf of Preferred Fresh such as vendor agreements and performance contracts.

While there was an issue raised as to whether the Debtor was ever an officer or director of Preferred Fresh, the evidence presented failed to convince the Court that

he was. Although Dijan and Bens referred to the Debtor as "Chairman," this was not reported to the Florida Secretary of State on the 2001 Annual Report of Preferred Fresh. Rather, Dijan was the only individual listed as an officer and director of Preferred Fresh on both that report and the stock certificates of Preferred Fresh. Furthermore, Dijan and Bens both testified that the Debtor had never been an officer or director of Preferred Fresh and they had only referred to him as the "Chairman" as an honorary title because he was responsible for their funding through Express. The only document that identified the Debtor as the Chairman of the Board of Directors of Preferred Fresh and the owner of more than ten percent (10%) of its outstanding stock was Preferred Fresh's PACA license. However, the Debtor testified that he has never seen the license, nor did he participate in the submission of the application and the documents required to obtain the license.

In sum, this Court finds that the evidence presented at trial was insufficient to show that the Debtor participated in the day-to-day management and control of Preferred Fresh. Accordingly, Monterey and Hollar and Greene failed to satisfy the first factor of the test for individual liability and therefore, the Court concludes the Debtor should not be held individually liable for the debts of Preferred Fresh.

## B. Dischargeability under 11 U.S.C. § 523(a)(4)

Monterey and Hollar and Greene have sought a denial of the Debtor's discharge under 11 U.S.C. § 523(a)(4). That section of the Bankruptcy Code excepts from discharge any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny. To establish a claim of nondischargeability based on fraud or defalcation pursuant to § 523(a)(4), a creditor must prove by a preponderance of the evidence that: 1.) a fiduciary relationship existed between the parties and 2.) the Debtor is guilty of defalcation or fraud while acting in his fiduciary capacity. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), *In re Pieper,* 119 B.R. 837, 839 (Bankr.M.D.Fla.1990). Thus, in order for Monterey and Hollar and Greene to prevail under § 523(a)(4), they must not only prove that the Debtor owed them a fiduciary duty, but also that the Debtor was guilty of a wrongful act of fraud or defalcation while acting in his fiduciary capacity. As discussed above, the evidence presented at trial was insufficient to show that the Debtor participated in the day-to-day management and control of Preferred Fresh. Therefore, this Court finds that no fiduciary relationship existed between the parties in this dispute.

Furthermore, this Court finds that Monterey and Hollar and Greene have failed to establish that the Debtor is guilty of a wrongful act of fraud or defalcation. "Defalcation" is defined as a "misappropriation of trust funds in any fiduciary capacity and failure to properly account for such funds." *In Re Zois,* 201 B.R. 501, 506 (Bankr.N.D.Ill.1996) (quoting *In Re Harper,* 150 B.R. 416, 419 (Bankr. E.D.Tenn.1993)). Monterey and Hollar and Greene have not presented sufficient evidence of any wrongful act of fraud or defalcation. The Debtor testified that Express continued to fund Preferred Fresh both as a factor and as an ordinary lender despite Preferred Fresh's escalating inability to repay the debt. In fact, Express only stopped funding when it no longer had the available funds and had to terminate its own business operations. There was no testimony or other evidence presented that the Debtor individually re-

ceived any funds at all from Preferred Fresh, or that Express received any funds from Preferred Fresh other than in the ordinary course as a factor. A sale of accounts receivable through a commercially reasonable factoring agreement does not violate the PACA trust. *Boulder Fruit Express & Heger Organic Farm Sales v. Transportation Factoring, Inc.*, 251 F.3d 1268 (9th Cir.2001).

Other than the receipt of funds through the factoring of the Preferred Fresh accounts receivable, there was no allegation raised which would imply an improper use of the Preferred Fresh funds by the Debtor or Express or any other act of wrongdoing by either the Debtor or Express. As a result, there was no evidence presented to indicate any kind of wrongdoing by the Debtor. Accordingly, it is appropriate for the Court to find that any debts of the Debtor to Monterey and Hollar and Greene are dischargeable.

## CONCLUSION

The Court finds that Monterey and Hollar and Greene have failed to show that the Debtor's involvement with Preferred Fresh was sufficient to establish legal responsibility. As such, the Debtor should not be held individually liable for the debts owed by Preferred Fresh. Furthermore, the Court finds that no fiduciary relationship existed between the parties in this dispute and the evidence presented at trial was insufficient to establish that the Debtor is guilty of a wrongful act of fraud or defalcation. Therefore, the Court concludes that it is appropriate to hold that the debts of the Debtor to Monterey and Hollar and Greene are dischargeable.

## ORDER

The Court, having reviewed the pleadings, having heard the testimony of the witnesses, having reviewed the exhibits admitted into evidence, having heard the argument of counsel and being otherwise being fully advised in the premises, does hereby:

**ORDER AND ADJUDGE** that:

1. Judgment shall be entered for the Defendant.

2. The Court reserves jurisdiction to award the Defendant actual costs associated with this adversary proceeding.

3. Pursuant to Federal Rule of Bankruptcy Procedure 9021, a separate Final Judgment will be entered in the above-referenced adversary proceeding contemporaneously herewith.